# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| PHOENIX LICENSING, LLC and | § | |
| LPL LICENSING, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 2:16-CV-00152-JRG-RSP |
| | § | (lead case) |
| CONSUMER CELLULAR, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

In this patent case, consolidated Defendant loanDepot.com, LLC moves the Court to award fees under 35 U.S.C. § 285. Def.'s Mot. to Find Exceptional Case [Dkt. # 255]. After full briefing and argument, the Court concludes the motion should be **DENIED**.

**I.      BACKGROUND**

In February 2016, Plaintiffs sued loanDepot for infringing claims of seven patents directed at generating customized marketing communications. *See generally* Compl. [Dkt. # 1] (No. 2:16-CV-00160). Plaintiffs accused loanDepot of infringing by "mak[ing] and us[ing] products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers." *Id.* ¶¶ 28–29.

At the time Plaintiffs filed this lawsuit, Richard Libman was the sole owner of LPL Licensing and the only inventor of the asserted patents. Plaintiffs characterize Libman as a

30-year veteran of sales and direct marketing who, at the time of the underlying applications, recognized the drawbacks of then-existing technology for producing sales communications. According to Plaintffs, Libman developed and patented the technology at issue and then provided or licensed the technology well before he decided to enforce his patent rights through litigation. *See generally* Compl. [Dkt. # 1] ¶¶ 1–4; Pls.' Resp. [Dkt. # 258] at 1 n.1.

loanDepot was not the only target of Plaintiffs' infringement claims. In 2016, Plaintiffs filed 11 other actions in this Court concerning the Libman patents.[1] The other defendants included wireless communications services providers, a pharmacy chain, insurances companies, banks, and a hospitality company. In total, Plaintiffs asserted claims from 10 patents against loanDepot and these other defendants. Def.'s Motion [Dkt. # 255] at 2 n.1.

In April 2016, Plaintiffs made an initial settlement offer to loanDepot, valuing a license at $2.2 million based on the estimated number of allegedly infringing direct mail communications. Letter from Ben Wang to Jennifer Trusso (Apr. 1, 2016) [Dkt. # 255-4] at 1. Plaintiffs offered to settle for $938,000, which they deemed "a substantial discount" to a reasonable licensing fee. *Id.*; Salinas Decl. [Dkt. # 255-2] ¶ 37. loanDepot rejected the offer.

In May 2016, many of the defendants challenged the patents as directed to patent-

---

[1] No. 2:16-CV-00153 through No. 2:16-CV-00161, No. 2:16-CV-00163, No. 2:16-CV-00164.

ineligible subject matter. *See* Think Finance, Inc.'s Mot. to Dismiss [Dkt. # 65]; Defs.' Rule 12(b)(6) Mot. to Dismiss [Dkt. # 68]; LendingClub Corp.'s Mot. to Dismiss [Dkt. # 103]; loanDepot.com's Mot. to Dismiss [Dkt. # 113]. Plaintiffs countered on the merits, but also argued that the defendants' motions were premature. *See generally* Pls.' Opp'n to Defs.' Mot. to Dismiss [Dkt. # 116]. Specifically, Plaintiffs contended claim construction was necessary for more than just the 10 claims the defendants characterized as representative of the patents' teachings. *Id.* at 3–14.

The patents were not strangers to such validity challenges. They had already withstood challenges from four reexaminations, numerous lawsuits, and a plethora of PTAB proceedings. *See, e.g.*, Docket Navigator Search Results (Apr. 19, 2017) [Dkt. # 255-5]. But with respect to these other lawsuits and proceedings, loanDepot alleges that Plaintiffs made a concerted effort to settle or otherwise avoid these challenges and thus sidestep any § 101 decisions on the merits. Def.'s Motion [Dkt. # 255] at 2–3.

In *Phoenix Licensing, LLC v. AAA Life Ins. Co.*, No. 2:13-CV-01081 (E.D. Tex.) (*AAA*), for example, Plaintiffs rendered moot the defendants' then-pending § 101 challenges with an amended complaint. Also, some *AAA* defendants had petitioned the PTAB to invalidate the patents, but Plaintiffs settled with the petitioners before a decision about whether to institute review. *See* Joint Mots. to Terminate CBM Review [Dkt. #s 255-16 to 255-30].

In *Phoenix Licensing, LLC v. Advance America*, No. 2:15-CV-01367 (E.D. Tex.) (*Advance America*), the Court declined to decide the defendants' § 101 challenges before

claim construction but allowed defendants to re-urge their motions within 20 days of the Court's claim-construction order. *See* Order [Dkt. # 25] (No. 2:15-CV-01375). Nonetheless, all of the *Advance America* defendants settled with Plaintiffs shortly after the Court construed the disputed claim terms and without renewing their § 101 challenges.

But back to *this* case. With no progress on settlement, the case moved to claim construction. The parties agreed to adopt the Court's constructions from *Advance America* (while preserving a right to appeal those constructions) and only seek constructions for five additional terms. The Court, however, rejected the parties' agreement as circumventing the local rules' page limits, and depriving the Court of the opportunity to cure any deficiencies before appeal. Order [Dkt. # 201] at 2. In response, loanDepot successfully moved to incorporate the *Advance America* order and briefing by reference while dropping the five additional terms, thereby obviating the need for further briefing. Defs.' Unopposed Mot. to Continue Cl. Constr. Hr'g [Dkt. # 208]. Plaintiffs declined to join the motion, but did not oppose. Salinas Decl. [Dkt. # 255-2] ¶ 43.

In February 2017, Plaintiffs again offered to settle with loanDepot, this time for an amount to be determined depending on the Court's ruling on patent eligibility. Salinas Decl. [Dkt. # 255-2] ¶ 45. Plaintiffs proposed that if the Court found all patents invalid, Plaintiffs would dismiss loanDepot at no cost. *Id.* If the Court found some or all of the patents valid, Plaintiffs would dismiss loanDepot for up to $100,000. *Id.* loanDepot rejected the offer. *Id.* ¶ 46.

In March 2017, the Court recommended that the Court grant the defendants' § 101

motions. R. & R. [Dkt. # 239]. Plaintiffs objected to the recommendation, arguing in part the need for further claim construction because of the high number of challenged claims. Pls.' Obj. to R. & R. [Dkt. # 246] at 3–4. Plaintiffs also offered loanDepot a covenant not to sue on any of Libman's patents to resolve the lawsuit. Emails Between Ben Wang & Jennifer Salinas (Mar. 24–26, 2017) [Dkt. # 255-39] at 1–2. loanDepot rejected the offer, Salinas Decl. [Dkt. # 255-2] ¶ 48, and shortly thereafter the District Judge adopted the recommendation, *see* Order [Dkt. # 248].

Generally, loanDepot's motion contends Plaintiffs unreasonably litigated a meritless case and should have known the patents were directed to ineligible subject matter. loanDepot emphasizes the high number of lawsuits against different types of defendants and Plaintiffs' propensity to settle in time to avoid § 101 decisions on the merits, which some courts have considered indicia of bad faith. Additionally, loanDepot criticizes Plaintiffs' behavior during claim construction and the nature of Plaintiffs' settlement offers.

For the following reasons, the Court concludes loanDepot has not met its burden of showing this is an "exceptional" case.

## II. APPLICABLE LAW

A district court may award reasonable attorney's fees to prevailing patent litigants in exceptional cases. 35 U.S.C. § 285. To be entitled to such an award, the prevailing party must prove the case is "exceptional" by a preponderance of the evidence. *Octane Fitness, LLC v. ICON Health and Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014). "An 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a

party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which was litigated." *Id.* at 1756.

"District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* These circumstances include motivation, objective unreasonableness, and considerations of compensation and deterrence. *See id.* at n.6.

"A case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Octane Fitness*, 134 S. Ct. at 1757. A showing of subjective bad faith requires that a "lack of objective foundation for the claim 'was *either* known *or* so obvious that it should have been known' by the party asserting the claim." *Kilopass Tech, Inc. v. Sidense Corp.*, 738 F.3d 1302, 1310 (Fed. Cir. 2013) (emphasis in original). Actual knowledge of baselessness is not required. *Id.*

## III. DISCUSSION

### A. Whether Plaintiffs unreasonably litigated a meritless case.

loanDepot first argues Plaintiffs litigated this case knowing it to be meritless. Def.'s Motion [Dkt. # 255] at 8–10. Specifically, loanDepot alleges Plaintiffs' business model comprises serially filing nearly identical lawsuits against many diverse defendants followed by unreasonably low settlement offers. *Id.* at 9. This, says loanDepot, shows a strategy to exploit the high cost of litigation to extract nuisance value settlements. *Id.* loanDepot argues Plaintiffs' last settlement offer even included affirmative compensation

in the form of a broad covenant not to sue on unrelated patents, which loanDepot argues is indicative of bad faith. *Id.* (citing *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826 (E.D. Tex. 2017)).

The Court disagrees with loanDepot for a number of reasons. First, while loanDepot criticizes Plaintiffs for asserting the patents against many diverse defendants in many industries, loanDepot does *not* contend that Plaintiffs' infringement reads against these diverse defendants were unreasonable. And while assertion of a patent against many types of defendants justifies further inquiry, that conduct is not by itself bad faith.

Second, Plaintiffs' settlement offers, in this and other cases, were not unreasonably low. In this case, Plaintiffs' initial settlement offer was $938,000, over 40% of Plaintiffs' $2.2 million valuation and far greater than amounts typically seen in "nuisance" cases. *See, e.g.*, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011) ("Viewed against Eon-Net's $25,000 to $75,000 settlement offer range, it becomes apparent why the vast majority of [accused infringers] chose to settle early . . . ."); *see also Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 849 (E.D. Tex. 2017) ("To determine whether a settlement offer is fair and made in good faith, it is not the absolute value of the settlement but rather the prospective recovery that must be evaluated, i.e., how much is at stake."). Additionally, Plaintiffs present evidence of settlement amounts with other parties far exceeding what would typically be considered "nuisance" values. *See* Wang Decl. [Dkt. # 258-1] ¶ 4 (declaring Plaintiffs' licenses ranged from $1.3 million to $6 million); *see also* Pls.' Resp. [Dkt. # 258] at 7 (representing an average licensing amount of $700,000).

Finally, loanDepot's "affirmative compensation" argument is not persuasive. In *Iris Connex*, the plaintiff paid money and granted licenses to unrelated patents to head off an adverse § 101 decision. *Iris Connex*, 235 F. Supp. 3d at 834. Here, however, Plaintiffs did neither.[2]

### B. Whether Plaintiffs' invalidity position was so weak that there was no reasonable basis for asserting the patents.

The Court disagrees that Plaintiffs should have known the patents were directed to unpatentable concepts. Plaintiffs filed these lawsuits in early 2016, but *Alice*'s jurisprudence did not begin to fully develop until late 2015. By then, § 101 challenges based on *Alice* were moving through the courts and under review by the Federal Circuit. Indeed, many of the cases on which the Court relied in granting the defendants' motion to dismiss were decided after Plaintiffs filed their lawsuits. *See, e.g.*, R. &. R. [Dkt. # 239] at 31–33.

Moreover, unlike many other cases where courts have awarded fees, Plaintiffs are not disconnected from the inventor and the patents' history. LPL Licensing was wholly owned by Libman, the sole inventor of the asserted patents who had an extensive history in sales and practiced the claimed inventions. In addition to their statutory presumption of validity, the patents had already withstood multiple validity challenges and been

---

[2] loanDepot characterizes some of the patents as "unrelated" because they were not asserted against, and had no value to, loanDepot even though they were in the same patent family. *See generally* H'rg Tr. (Mar. 1, 2018) [Dkt. # 267] at 61:13–62:4. This is distinguishable from the facts in *Iris Connex*, where the plaintiffs promised not to sue on patents owned by third parties to the lawsuit. *Iris Connex*, 235 F. Supp. 3d at 834.

successfully monetized for an extensive period. Plaintiffs also invested significant sums in their enforcement efforts. *See* Hr'g Tr. (Mar. 1, 2018) [Dkt. # 267] at 32:12 (representing Plaintiffs spent over $500,000 on experts). In other words, the facts show this is not a case where the plaintiffs acquired the patents on the cheap and then incurred minimal litigation costs and fees while hoping for a quick and easy settlement.

### C. Whether Plaintiffs engaged in claim construction in bad faith.

loanDepot next criticizes Plaintiffs for how they handled claim construction. Specifically, loanDepot claims Plaintiffs took evasive positions and proposed constructions they had no intention of using. *See* Def.'s Motion [Dkt. # 255] at 13–14. loanDepot stresses that Plaintiffs refused to join its motion to streamline claim construction and sought additional constructions late in the process to delay the Court's invalidity decision. *Id.* at 14.

Early on, Plaintiffs argued for claim construction spanning far more than the 10 claims the defendants considered "representative." Pls.' Opp'n to Defs.' Mot. to Dismiss [Dkt. # 116] at 3–14. Plaintiffs' objections to the Court's recommendation simply reiterated that position. Moreover, Plaintiffs' refusal to join loanDepot's motion is of no consequence: Plaintiffs did not oppose the motion, and there is little practical difference between the two postures.

### D. Other loanDepot arguments are not fully supported by the record.

Finally, loanDepot makes a number of seemingly compelling arguments that, after closer inspection, become less convincing. For example, loanDepot attacks Plaintiffs for

making an immediate settlement offer after filing their Complaint. *See* Def.'s Motion [Dkt. # 255] at 2 (noting "Plaintiffs sent an initial settlement demand letter to loanDepot with their filed Complaint"). Although quick settlement demands can support a bad-faith finding, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011), loanDepot ignores that Plaintiffs' initial settlement offer came at loanDepot's request. *See* Wang Decl. [Dkt. # 258-1] ¶ 2; Email from Ben Wang to Beth Kearney (Mar. 11, 2016) [Dkt. # 258-2]. That fact greatly diminishes the argument's effectiveness.

In the same vein, loanDepot contends that Plaintiffs settled with the *Advance America* and *AAA* defendants to avoid a decision on patent-eligibility. Regarding *Advance America*, loanDepot argues that, after the Court construed the disputed terms, Plaintiffs quickly settled with the defendants to avoid the renewal of their § 101 challenges. By then, however, only four defendants remained in the case, and those defendants settled before or at roughly the same time as the Court's order on claim construction. *See* Civil Dkt. for Case #:2:15-cv-01367-JRG-RSP [Dkt. # 255-7] at 4–22 (identifying the termination dates for all but four defendants as prior to Oct. 25, 2016); *id.* at 39–40 (showing the Court entered its claim-construction order on Oct. 25, 2016 and dismissed the remaining four defendants between Oct. 24 and Nov. 8); *see also* Hr'g Tr. (Mar. 1, 2018) [Dkt. # 267] at 21:15–18 (representing that "[a]ll of those Defendants, in fact, were in advanced settlement discussions even before [Plaintiffs] knew that the *Markman* order was going to issue"). Clearly the settlements were not a mad rush to avoid more § 101 challenges.

With respect to *AAA*, loanDepot stresses that Plaintiffs' amending of the complaint

rendered moot the *AAA* defendants' pending § 101 motions. But the *AAA* defendants did not oppose the amendment, which was part of a compromise to alter the schedule and add a new patent to the case. *See* Joint Mot. to Amend Dkt. Control Order [Dkt. # 227] at 3 ("Subject to the Court's adoption of the proposed amended schedule, Plaintiffs and the Consolidated Defendants have reached a compromise according to which the Consolidated Defendants will not oppose amendment of Plaintiffs' complaints.").

Simply put, the record does not support a conclusion that Plaintiffs were trying to avoid § 101 decisions on the merits. Even here, Plaintiffs' variable-scale settlement offer undercuts loanDepot's claim, as it would have conditioned the final settlement terms on the Court's § 101 decision. In the older cases, the Court fails to see any advantage to Plaintiffs by avoiding the re-urging of previously filed motions to dismiss. After all, the defendants' § 101 arguments were already in the record, and a decision on patent-eligibility would not have been immediate.

\* \* \*

For the Court to grant loanDepot's motion, loanDepot must prove the case is "exceptional" by a preponderance of the evidence when considering the totality of the circumstances. For the reasons set forth above, the Court concludes loanDepot has not met that burden and **DENIES** Defendant's Motion to Find an Exceptional Case [Dkt. # 255].

**SIGNED this 12th day of March, 2018.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE